Kevin P. Mulry, Esq.
Farrell Fritz, P.C.
1320 RXR Plaza
Uniondale, New York 11556-1320
Tel. (516) 227-0620

Geoffrey R. Kaiser, Esq.
Kaiser Law Firm, PLLC
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 570-3071

David A. Zarett, Esq.
Weiss & Zarett, P.C.
3333 New Hyde Park Rd., Suite 211
New Hyde Park, New York 11042
Tel: (516) 627-7000

Attorneys for Relator Irina Gelman

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and NEW YORK STATE, ex rel. IRINA GELMAN, DPM, | : : : | Case No. CV-12-5142  (RJD) (MDG) |
| Plaintiffs, | : | FIRST AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL CIVIL FALSE |
| vs. | : | CLAIMS ACT [31 U.S.C §§ 3729 *et seq.*] and NEW YORK FALSE CLAIMS ACT [N.Y. |
| GLENN J. DONOVAN, DPM, NEW YORK CITY HEALTH and HOSPITALS CORPORATION and PHYSICIAN AFFILIATE GROUP OF NEW YORK, P.C., | : : : | Finance Law §§ 187 *et seq.*]  JURY TRIAL DEMANDED  **(FILED *IN CAMERA* AND UNDER SEAL)** |
| Defendants. | : |  |

-----------------------------------------------------------x

Plaintiff-Relator Irina Gelman, DPM, through her attorneys of record, on behalf of the

United States of America and New York State, for her Complaint against Defendants Glenn J.

Donovan, DPM, New York City Health and Hospitals Corporation and Physician Affiliate Group of New York, P.C., alleges as follows:

## I.    NATURE OF THE ACTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America and New York State arising from false and/or fraudulent statements, records, and claims made and caused to be made by Defendants and/or their agents, employees and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* and the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*

2.      As detailed below, Defendants knowingly engaged in a fraudulent course of conduct that, on information and belief, caused millions of dollars in losses to the Medicare and Medicaid programs, by inducing: (a) payments for teaching physician services that were not reimbursable; (b) payments for hospital services rendered by podiatry residents that were not reimbursable; and (c) funding for graduate medical education ("GME") costs associated with a podiatric medicine and surgery residency program ("PMSR Program") that imperiled the safety of patients, did not comply with the requirements for an approved residency program entitled to federal and state cost reimbursement, and was predicated upon false and misleading hospital cost reports that claimed GME costs without disclosing the fraud permeating the PMSR Program.

3.      Specifically, over the course of several years, Defendants billed Medicare and Medicaid for professional services performed by graduate podiatric residents at Coney Island Hospital ("CIH") as if Defendant Glenn J. Donovan, DPM ("Donovan") – the PMSR Program Director -- were physically present as the attending physician supervising the services rendered when, in fact, Donovan was neither present nor personally involved in the patient treatment, which was conducted entirely by the residents.

4.      Defendants also applied for and received funding from Medicare and Medicaid for GME costs related to the PMSR program at CIH, notwithstanding that the program did not actually comply with the standards and requirements established by the relevant credentialing body, the Council on Podiatric Medical Education ("CPME").   In order to maintain the "approved" status of the PMSR program, and continue to receive federal funding from Medicare and Medicaid for direct and indirect GME costs associated with the program, Defendants misrepresented resident credentials and concealed material facts that would have revealed the fraudulent nature of the program, causing CPME to withdraw program approval and causing Medicare and Medicaid to deny GME funding.   Among other things, Defendants fraudulently inflated clinical patient encounters attributed to some residents in order to enable those residents to fraudulently graduate from the program, altered medical records to create the false impression that residents had attained certain clinical competencies, and allowed residents to perform surgical procedures on patients without a residency permit or license.   Defendants further concealed the corrupt nature of the PMSR Program from the federal and state governments when reporting GME costs on CIH's annual cost reports, and by seeking and accepting reimbursement of those costs from Medicare and Medicaid without disclosing that the "approved" status of the PMSR program was being fraudulently maintained.

5.      The fraudulent practices described above constituted "false and fraudulent" claims under the Federal Civil False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq*. and the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.* Such claims cheated the government and unlawfully enriched the Defendants.   Therefore, Plaintiff/Relator, Irina Gelman, DPM, seeks to recover all available damages, civil penalties, and other relief for violations alleged herein.

II.    **PARTIES**

6.      Plaintiff-Relator Irina Gelman, DPM ("Relator") resides in Johnstown, New York.  Relator received her Doctorate in Podiatric Medicine in 2010 from the New York College of Podiatric Medicine, has a license to practice podiatry in New York State and had a limited residency permit authorizing her to practice podiatry in New York State as a resident when she was enrolled in an approved graduate medical education program.  Until in or about late 2013, Relator was a graduate podiatric resident at CIH, and had been in that position since July 2010.  As a podiatry resident, Relator worked long hours, on a limited pay scale, and was typically one of the first healthcare professionals to consult on a podiatry patient at CIH.   Relator's professional duties included consulting on patients at the outpatient podiatry clinic at CIH Hospital, assisting on surgical cases, and consulting on emergency room and inpatient podiatry patients at CIH.  As a result of these patient interactions, Relator would regularly make entries into the medical records maintained by CIH for these patients.  Relator also attended lectures and courses in furtherance of her education and training in the PMSR Program.  In January 2014, after leaving the CIH PMSR Program, Relator was appointed the Public Health Director in Fulton County, New York,

7.      Defendant Glenn J. Donovan, DPM is a licensed podiatrist in the State of New York and the Program Director of the PMSR Program at CIH.   On information and belief, Donovan resides in Staten Island, New York.

8.      Defendant New York City Health and Hospitals Corporation ("HHC") is a public benefit corporation created by the State Legislature in 1969 to operate the municipal health facilities in New York City.  HHC is a $6.7 billion integrated healthcare delivery system and is the largest municipal healthcare organization in the country, serving 1.4 million New Yorkers

annually through its 11 acute care hospitals, four skilled nursing facilities, six large diagnostic and treatment centers and more than 70 community based clinics.

9.      Coney Island Hospital is a municipal hospital owned and operated by HHC, located at 2601 Ocean Parkway, Brooklyn, New York.

10.     Defendant Physician Affiliate Group of New York, P.C. (PAGNY) is a New York professional corporation with a principal address of 55 West 125th Street, Suite 1001, New York, New York 10027.  According to its website, PAGNY is New York State's largest multispecialty physician group and is affiliated with HHC.  Beginning in or about 2010, PAGNY assumed professional staffing and billing responsibilities at several HHC hospitals, including CIH.  Upon information and belief, PAGNY employs Donovan.

## III.   JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Relator is the original source of the facts and information alleged in this Complaint.

12.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States.  Moreover, the Defendants can be found in this District and transact business in this District.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because the Defendants can be found in and transact business in this

District. At all times relevant to this Complaint, Defendants regularly conducted substantial business within this District, maintained employees in this District and can otherwise be found and reside in this District.  In addition, statutory violations, as alleged herein, occurred in this District.

## IV.    APPLICABLE LAW

### A.        The False Claims Act

14.     The FCA was originally enacted during the Civil War and was substantially amended in 1986. Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

15.     The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, it prohibits knowingly making or using a false or fraudulent record or statement "material to a false or fraudulent claim" paid or approved by the federal government, or "material to an obligation to pay" money to the government and further prohibits knowingly concealing and improperly avoiding or decreasing "an obligation to pay" money to the government. 31 U.S.C. § 3729(a)(1)(B), (G).  Pursuant to 31 U.S.C. § 3729(a)(1)(B), a false or fraudulent statement or record that is made for the purpose of causing the government to pay a claim, even if the fraudulent statement or record is not proffered directly to the government, is still actionable where there is some nexus between the statement or record and the payment of the claim.  Furthermore, both affirmative misrepresentations and the omission of facts material to

a governmental decision to pay can render a claim false under the FCA.  The FCA also prohibits two or more parties from conspiring to violate any of the liability provisions of the statute. 31 U.S.C. § 3729(a)(1)(C).

16.     Any person who violates, or conspires to violate, the FCA is liable for a civil penalty of up to $11,000 per claim for claims made on or after September 29, 1999, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a).

17.     The FCA does not require direct contact between a defendant and the government. By its terms, the FCA imposes liability on any person who presents or *causes* to be presented a false or fraudulent claim to the government (or false statement in support of a false or fraudulent claim). See 31 U.S.C. § 3729(a).

18.     To "cause" an FCA violation, it is not necessary that a defendant's fraudulent conduct be the last in the series of events that results in financial loss to the government. As applied by the courts, the standard for "causation" under the FCA is whether the submission of a false or fraudulent claim was "reasonably foreseeable" from a defendant's actions. Under this standard, a defendant's fraudulent conduct can occur anywhere in the chain of events leading to financial loss by the government, and can be an indirect, as well as direct, cause of the loss. Moreover, the defendant need not be the recipient or beneficiary of the false claim. All that is required is that the defendant, by its fraudulent conduct, set in motion a series of events which results in a reasonably foreseeable loss to the government.

19.     The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States government provides any portion of the money or property which is

requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

20.        The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

21.        The New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*, is modeled after the FCA, and its liability provisions are virtually identical.   Similarly to the FCA, any person who violates, or conspires to violate, the New York False Claims Act is liable for three times the amount of the damages sustained by New York State.   In addition, a violator faces a civil penalty of up to $12,000 per claim.

### B.        The Federal Health Care Programs

22.        The health care programs described in the paragraphs below, and any other government-funded healthcare programs, shall be referred to as "Federal Health Care Programs."

23.        The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare") is a health insurance program administered by the United States that is funded by taxpayer revenue.  Entitlement to Medicare is based on age, disability or affliction with certain diseases.  The program is overseen by the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"). Medicare provides for payment of hospital services, medical services, durable medical equipment and prescription drugs on behalf of Medicare-eligible beneficiaries.

24.     Claims submitted to Medicare for payment, whether submitted on a paper UB-04 (CMS-1450) Claim Form, or electronically, carry certifications of truth and accuracy.  The paper Claim Form carries a certification that the billing information on the form is true, accurate and complete, and that the provider submitting the form did not knowingly or recklessly disregard or misrepresent or conceal material facts.  *See* UB-04 (CMS-1450) Claim Form.  The Claim Form further states that the person or entity submitting the form "understands that misrepresentation or falsification of essential information as requested" by the form "may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment . . . ." *Id.*  Those who submit claims electronically are likewise required to certify that the claims are "accurate, complete and truthful" and to "acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim . . . may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Medicare Claims Processing Manual, Chapter 24, 30.2.

25.     The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid") is a health insurance program administered by the United States and individual states and is funded by federal, state and local taxpayer revenue.  The Medicaid Program is overseen by HHS through CMS.  Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.  The Medicaid program pays for services pursuant to plans developed by the States and approved by HHS through CMS.  42 U.S.C. §§ 1396a(a)-(b).  States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical

items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as Federal Financial Participation.

26.    New York maintains a federally-approved Medicaid program to reimburse health care charges made by physicians and other health care providers for the treatment of many low-income New York citizens not covered by Medicare or private insurance.  Claims submitted to the New York Medicaid Program cause payments to be made by both the United States and New York State.  The United States and New York State contribute approximately half the cost of each claim submitted to the New York Medicaid Program.  Providers apply to participate in the New York Medicaid Program and agree as a condition of both participation and payment to comply with all the policies and procedures of the New York Department of Health ("DOH"), which administers the Medicaid Program in New York State.  All claims submitted to the Medicaid Program, whether on paper or electronically, carry a Claim Certification Statement that certifies the provider's agreement to these conditions.  The Certification Statement further states that all information included on the claim form is "true, accurate and complete" and that "no material fact has been omitted." New York State Medicaid Program, Information for All Providers, General Billing, pp. 7-8; eMedNY/Medicaid Management Information System, Certification Statement for Provider Billing Medicaid.  In addition, the Certification Statement includes an acknowledgement that "payment and satisfaction of this claim will be from federal, state and local public funds and that I may be prosecuted under applicable federal and state laws for any false claims, statements or documents or concealment of a material fact." *Id.*

27.     DOH policies and procedures include an explicit exclusion from Medicaid coverage for medical care and services that are "fraudulently claimed" or "represent abuse or overuse," and define as an "unacceptable practice" when a provider "knowingly [makes] a claim for an improper amount or for unfurnished, inappropriate or excessive care, services or supplies." DOH also defines Medicaid fraud to include a provider who "submits false information for the purpose of obtaining greater compensation than that to which he/she is legally entitled." New York State Medicaid Program, Information for All Providers, General Policy, pp. 22-25. DOH further reserves the right to recover any overpayments, including "any amount not authorized to be paid under the Medicaid Program, whether paid as the result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake." *Id.*

28.     To participate in Medicare and Medicaid, providers must be duly licensed and authorized by the States in which they practice to render professional services. See Medicare General Information, Eligibility and Entitlement, Chapter 5, 70.3; 18 NYCRR § 505.12.

**C.     Reimbursement for Physician Services Rendered in Teaching Settings**

29.      Medicare and Medicaid pay for professional services furnished by attending physicians in teaching settings, such as a GME program, under certain circumstances.  For these purposes, Medicare defines "physician" as including a doctor of podiatric medicine who is legally authorized by the State in which he or she practices. 42 U.S.C. § 1395x(r); Medicare General Information Eligibility and Entitlement, Chapter 5, 70.3.  Medicaid does not include a podiatrist within the definition of physician.

30.     As relevant to the PMSR program at CIH, in order for services that are furnished by teaching physicians to be reimbursed by Medicare, those services must be performed either: (a) "by a physician who is not a resident;" or (b) by a resident when a "teaching physician is

physically present during the critical or key portions of the service." CMS Fact Sheet, "Guidelines for Teaching Physicians, Interns and Residents" at p. 1; see 42 CFR §§ 415.170, 415.172, 415.174. When a resident visits a patient without the teaching physician being present, the teaching physician must repeat the key portions of the visit and have his or her own documentation in order to get paid. Medicare Benefit Policy Manual ("MBPM"), Chapter 15, 30.2.

31. Examples of reimbursable services include reviewing patient history and performing physical exams, personally examining the patient within a reasonable time after admission, confirming or revising diagnoses, determining the treatment to be followed, assuring that any supervision needed by interns or residents is furnished, and reviewing the patient's progress. MBPM, Chapter 15, 30.2. Surgical services are reimbursable only if the teaching physician is present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. 42 CFR § 415.172(a)(1).

32. To qualify such claims for reimbursement, the medical record must contain signed or countersigned notes by the physician proving that the physician personally reviewed the patient's diagnoses, visited the patient at critical times of the illness, and discharged the patient. MBPM, Chapter 15, 30.2. For surgical procedures, there must be notes in the record by interns, residents, or nurses, indicating that the attending physician was physically present when the service was rendered. _Id._ In addition, the teaching physician must be identified as such on the claims by including a GC modifier for each service to indicate: "This service has been performed in part by a resident under the direction of a teaching physician." MBPM, Chapter 12, 100.1-100.2; CMS Fact Sheet, "Guidelines for Teaching Physicians, Interns and Residents." By including the GC modifier, the provider is certifying that he or she has complied with the requirements for billing such services. _Id._

33.     It is unclear whether the New York Medicaid policy manual for podiatrists, which is currently removed from the DOH website while the manual is being updated, specifically authorizes the billing for services of a teaching physician who is a podiatrist. However, in the absence of any explicit direction on this issue by DOH, the New York Medicaid Program follows Medicare reimbursement rules in determining allowable costs (10 NYCRR § 86-1.6(a) (except as otherwise provided by regulation or special determination of commissioner, "allowable costs shall be determined by the application of the principles of reimbursement developed for determining payments under the title XVIII (Medicare) program"); 18 NYCRR § 600.3(c) ("Reimbursement will be available only for expenditures permitted by State or Federal law or regulation."). Accordingly, to the extent that the New York Medicaid Program allows any reimbursement at all for teaching physician services in the context of a podiatric medicine and surgery residency program, it would do so only under conditions acceptable to the federal government under the Medicare program.

34.     Medicaid's tracking of Medicare requirements in this regard is evidenced by the Medicaid policy manual published by DOH for doctors or medicine and osteopathy licensed under Article 131 of the New York Education law. According to that manual, physicians who are M.D.s or D.O.s may bill Medicaid while supervising a resident, provided that "personal and identifiable services are provided by the teaching physician to the patient in connection with the supervisory services." New York State Medicaid Program Physician Manual – Policy Guidelines, Supervising/Teaching Physicians, p. 25. There must be documentation of the teaching physician's personal involvement in the medical record, "including the extent of [the teaching physician's] participation in the history, examination, and complexity of the medical decision-making used to determine the level of service." *Id.* To bill for surgical procedures, the

teaching physician must be present during all critical and key portions of the procedure and be immediately available to furnish services during the entire procedure. *Id.* at pp. 26-27. Further, when services provided by a resident in a hospital outpatient department or freestanding clinic setting are being billed to Medicaid, the teaching physician must document at least the following:

> a. that the teaching physician performed the service or was physically present during the key or critical potions of the service when they were performed by the resident; and
>
> b. that the teaching physician participated in the management of the patient.

*Id.* at pp. 25-26. According to the Medicaid billing guidelines, "a facility may bill Medicaid for a clinic visit performed by a resident only when there is appropriate supervision and documentation in the record." "[D]ocumentation should . . . reference the resident's notes" and "[a]dequate documentation, along with the [teaching] physician's countersignature, indicates involvement of the [teaching] physician and makes the provided service billable to Medicaid." *Id.* at p. 25. These documentation requirements apply to both salaried physicians and physicians billing Medicaid fee-for-service.

**D.    Reimbursement for Hospital  Services Rendered by Podiatry Residents**

35.    Aside from reimbursement for teaching physician services, Medicare and Medicaid also provide for reimbursement of hospital services rendered by residents in certain circumstances. Medical or surgical services furnished by residents are included by Medicare as inpatient hospital services if they are provided by the resident under an approved teaching program. 42 CFR §§ 409.10(7), 409.15. As relevant here, that would include a resident-in-training "in the field of podiatry under a teaching program approved by" the Council on Podiatric Medical Education. (42 CFR § 409.15(c)). These services are paid as direct and indirect medical education payments, which are discussed in more detail below.

36.   Medicaid likewise pays for "personal and identifiable services . . . by the . . . resident with oversight by the attending physician to the Medicaid patient" in an inpatient setting. Medicaid Inpatient Policy Guidelines, at p. 10 (November 21, 2012).   Supervision by the attending physician must include: (1) "review of the patient's history and physical examination"; (2) "personal examination of the patient within a reasonable period after admission"; (3) "confirmation or revision of the diagnosis";  (4) "determination of the course of treatment to be followed"; (5) "assurance that any supervision needed by . . . residents was furnished; and (6) "frequent review of the patient's progress." *Id.* Furthermore, "evidence of ongoing supervision and oversight by the attending physician" must be "identified in the patient's medical record" and "[s]urgical residents must have personal supervision by the attending physician." *Id.*   As noted earlier, however, the Medicaid law does not define podiatrists as "physicians" and thus supervision of podiatry residents by licensed podiatrists would not satisfy the terms of these Medicaid inpatient policy guidelines.

37.   In the outpatient setting, Medicaid pays for medical services, including podiatry services.  Medicaid requires that such services be provided by a licensed health care professional in accordance with DOH regulations. "Medical services" are defined as the "services of physicians, nurse practitioners, licensed practical nurses, registered nurses, registered physician's assistants and *other health care professionals licensed and certified by the Education Department to*" treat patients (emphasis added). New York State Medicaid Program, Policy Guidelines for Article 28 Certified Clinics, at p. 39.  In providing medical services, a hospital outpatient department "must comply with all applicable provisions of State law." *Id.* at p. 39. When billing Medicaid for services provided by a hospital outpatient department, the claim "*must* reflect the actual service rendered to the patient and must be consistent with the scope of

practice, certification and/or profession of the rendering provider," who must be a "qualified licensed practitioner." *Id.* at p. 5. Unlicensed podiatry residents would not meet this definition. It bears emphasis, moreover, that "[r]esidents and interns (even if licensed) do not function independently" in the outpatient clinic setting and "should only provide medical care under appropriate supervision." New York State Medicaid Update, June 2009, Volume 25, Number 7.

**E. Medicare and Medicaid Funding for Approved GME Programs**

38. Medicare and Medicaid also contribute funds to pay the costs associated with approved graduate medical education ("GME") programs. Pursuant to 42 U.S.C. § 1395ww(h) and 42 C.F.R. §§ 412.105 and 413.75 *et seq.*, Medicare pays for both direct ("DME") and indirect ("IME") costs of GME programs. Under Medicaid, States may elect in their plans to provide additional funding for GME programs, subject to approval by CMS. The New York Medicaid Program provides such additional funding for GME programs, which is added as a component to a hospital's inpatient rates. New York State funds this program with general budget appropriations through DOH. As with Medicare, the New York Medicaid Program funds both the DME and IME costs of GME.

39. Payments for DME, among other things, help cover the costs incurred by hospitals for medical residents and teaching faculty, including salaries, fringe benefits, and allocations of overhead. Calculation of Medicare's share of the DME amount is obtained by multiplying the number of Full-Time Resident Equivalents by the authorized per-resident amount and then multiplying that result by the hospital's Medicare patient load. 42 C.F.R. §§ 413.76, 413.77. These Medicare amounts are calculated and paid based on information included in the hospital's cost report. Calculation of Medicaid's share of the DME amount in New York is likewise based

on the hospital's cost report and determined as set forth in the New York Public Health Law and related regulations. New York Public Health Law § 2807-c; 10 NYCRR Part 86.

40.     Payments for IME are intended to cover the additional incremental costs associated with the more intensive care, aggressive treatment and increased availability of state of the art testing technologies found in teaching hospitals and related to the training of residents. Calculation of Medicare's share of the IME amount is based on information included in the hospital's cost report and utilizes a complex formula established by regulation. 42 C.F.R. § 412.105.    As with DME, calculation of Medicaid's share of the IME amount in New York is based on the hospital's cost report and determined as set forth in the New York Public Health Law and related regulations. New York Public Health Law § 2807-c; 10 NYCRR Part 86.

41.     Hospital cost reports are submitted on a CMS-approved form that contains both an advisory and a certification of truth and accuracy. The advisory states:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, AND/OR IMPRISONMENT UNDER FEDERAL LAW.    FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

The certification, which appears immediately below the advisory, states:

> I hereby certify that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [the hospital] for [the relevant cost reporting period] and to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.

42.     Hospitals must have approved graduate medical education programs to qualify for

DME and IME payments under the Medicare and Medicaid programs.  In the field of podiatric

medicine, an "approved" program is a residency program approved by the Council on Podiatric

Medical Education ("CPME") of the American Podiatric Medical Association ("APMA"). 42

C.F.R. §§ 413.75(b), 415.152.   CPME is authorized by APMA to approve hospitals that sponsor

residency programs that demonstrate compliance with the standards and requirements published

by CPME.  "Approval" is the recognition accorded residency programs that are determined to be

in substantial compliance with such standards and requirements.  Approval is based on an overall

evaluation of the program and periodic review by the Residency Review Committee ("RRC").

The RRC is comprised of two representatives each from the American Board of Podiatric

Orthopedics and Primary Podiatric Medicine and the American Board of Podiatric Surgery, one

representative from the Council of Teaching Hospitals of the American Association of Colleges

of Podiatric Medicine, one representative from residency programs at large (selected by CPME),

and at least two CPME members.

43.     Among the many standards and requirements published by CPME, with which a

podiatric residency program must comply in order to achieve and maintain approved status -- and

thus remain eligible for Medicare and Medicaid funding -- are the following, which are taken

directly from the CPME publication entitled "Standards and Requirements for Approval of

Residencies in Podiatric Medicine and Surgery":

> *The following standards pertain to all residency programs for which initial or continuing approval is sought. The standards encompass essential elements including sponsorship, administration, program development, clinical expectations, and assessment.*

**INSTITUTIONAL STANDARDS:**

* * *

3.0    **The sponsoring institution formulates, publishes, and implements policies affecting the resident.**

* * *

3.10    *The sponsoring institution shall develop a residency manual to include, but not be limited to the policies and mechanisms affecting the resident, rules and regulations, curriculum, training schedule, assessments, didactic activities schedule, and journal review schedule.*

The sponsoring institution must ensure that the residency manual is distributed to and acknowledged in writing by the resident at the beginning of the program and following any revisions. The manual must be distributed at the beginning of the training year to the faculty and administrative staff involved in the residency.

The manual may be in written or electronic format. The manual must include CPME 320, *Standards and Requirements for Approval of Podiatric Medicine and Surgery Residencies* and 330, *Procedures for Approval of Podiatric Medicine and Surgery Residencies.*

***

3.12    *The sponsoring institution shall ensure that the residency program is established and conducted in an ethical manner.*

The conduct of the residency program must focus upon the educational development of the resident rather than on service responsibility to individual faculty members.

4.0    **The sponsoring institution reports to the Council on Podiatric Medical Education regarding the conduct of the residency program** in a timely manner and at least annually.

4.1    *The sponsoring institution shall report annually to the Council office on institutional data, residents completing training, residents selected for training, changes in the curriculum, and other information requested by the Council and/or the Joint Residency Review Committee.*

4.2    *The sponsoring institution shall inform the Council office in writing within 30 calendar days of substantive changes in the program.*

The sponsoring institution must inform the Council of changes in areas including, but not limited to, sponsorship, affiliated training sites, appointment of a new director of podiatric medical education, curriculum, and resident transfer.

**PROGRAM STANDARDS:**

**5.0    The residency program has a well-defined administrative organization with clear lines of authority and a qualified faculty.**

***

5.3    *The program director shall be responsible for the administration of the residency in all participating institutions. The program director shall be able to devote sufficient time to fulfill the responsibilities required of the position. The program director shall ensure that each resident receives equitable training experiences.*

The director is responsible for maintenance of records related to the educational program, communication with the Residency Review Committee and Council on Podiatric Medical Education, scheduling of training experiences, instruction, supervision, evaluation of the resident, periodic review and revision of curriculum content, and program self-assessment. In a co-sponsored program, the director is responsible for ensuring that the Council is provided requested information for all residents at all training sites, not just at one of the co-sponsoring sites (e.g., the institution at which the director is based).

The director must not delegate to the resident maintenance of records related to the educational program, communication with the Residency Review Committee and Council on Podiatric Medical Education, scheduling of training experiences, instruction, supervision, evaluation of the resident, periodic review and revision of curriculum content, and program self-assessment.

The director must ensure resident participation in training resources and didactic experiences (e.g., lectures, journal review sessions, conferences, and seminars).

***

5.5    *The residency program shall have a sufficient complement of podiatric and non-podiatric medical faculty to achieve the stated competencies of the residency and to supervise and evaluate the resident.*

The complement of faculty relates to the number of residents, institutional type and size, organization and capabilities of the services through which

the resident rotates, and training experiences offered outside the sponsoring institution.

Faculty members must take an active role in the presentation of lectures, conferences, journal review sessions, and other didactic activities. Faculty members must supervise and evaluate the resident in clinical sessions and assume responsibility for the quality of care provided by the resident during the clinical sessions that they supervise. Faculty members must discuss patient evaluation, treatment planning, patient management, complications, and outcomes with the resident and review records of patients assigned to the resident to ensure the accuracy and completeness of these records.

***

**6.0     The podiatric medicine and surgery residency is <u>a resource-based, competency-driven, assessment-validated program</u> that consists of three years of postgraduate training in inpatient and outpatient medical and surgical management. <u>The sponsoring institution provides training resources that facilitate the resident's sequential and progressive achievement of specific competencies.</u>**

*6.1     The curriculum shall be clearly defined and oriented to assure that the resident achieves the competencies identified by the Council.*

The curriculum must be distributed at the beginning of the training year to all individuals involved in the training program including residents and faculty.

<u>The curriculum must provide the resident appropriate and sufficient experiences in the supervised diagnosis and management of patients</u> with a variety of diseases, disorders, and injuries through achievement of the competencies listed below. . .

*6.2     The sponsoring institution shall require that the resident maintain web-based logs in formats approved by the RRC documenting all experiences related to the residency.*

***

*6.6     The residency curriculum shall afford the resident instruction and experience in hospital protocol and medical record-keeping.*

<u>The program director must assure that patient records accurately document the resident's participation in performing history and physical examinations and recording of operative reports, discharge summaries, and progress notes.</u> The resident should participate in quality assurance and utilization review activities.

21

* * *

     6.9    *The residency program shall ensure that the resident is afforded appropriate faculty supervision during all training experiences.*

**7.0    The residency program conducts self-assessment and assessment of the resident based upon the competencies.**

     7.1    *The program director shall review, evaluate, and verify resident logs on a monthly basis.*

The program director must review the logs for accuracy to ensure that there is no duplication, miscategorization, and/or fragmentation of procedures into their component parts. Procedure notes must support the selected experience.

     7.2    *The faculty and director of podiatric medical education shall assess and validate, on an ongoing basis, the extent to which the resident has achieved the competencies.*

The program director must conduct a formal semi-annual meeting with the resident to review the extent to which the resident is achieving the competencies. Information from patients and/or peers having direct contact with the resident may contribute to the assessments.

The assessments must be written or completed in an electronic format. The assessment instrument must identify the dates covered and the name of the faculty member. The assessment must be signed (signature and printed name) and dated by the faculty member, the resident, and the program director. The instrument must include assessment of the resident in areas such as communication skills, professional behavior, attitudes, and initiative. The timing of the assessment for each competency must allow sufficient opportunity for remediation.

The program should require that the resident take in-training examinations as prescribed by JCRSB-recognized specialty boards. If the resident is required to take an in-training examination(s), the sponsoring institution must pay any fees associated with the examinations. Examination results are used as a guide for resident remediation and as part of the annual self-assessment of the program.

(Emphasis added).

    44.    As noted in Institutional Standard 4.0, hospitals with approved podiatric residency

programs must complete an annual report form, beginning with the program's first year of provisional approval. The annual report, CPME Form 340, provides the Council with current information about the residency program.  As part of the annual report, CPME requests the names of residents completing the program and the residents selected for the next training year. CPME also requests specific quantitative information related to the clinical experiences of the residents. This information is reviewed by the RRC and may be consulted in determining increases in authorized residency positions and/or changes in approval status, as well as to prepare for an on-site evaluation of the program.

45.    CPME staff reviews the annual report and brings any concerns to the attention of the RRC at its next scheduled meeting.  CPME staff may correspond with the PMSR Program Director to request specific information for consideration at the RRC's meeting.  The annual report must be certified by the program's Chief Administrative Officer ("CAO") and both the CAO and the Program Director are responsible for reviewing the report for accuracy before it is certified.  A failure to submit the annual report is cause for CPME to place the hospital on administrative probation and consider withdrawing CPME's approval.  In addition, the hospital is required, through the Program Director, to inform CPME in writing within thirty (30) days of any substantive changes to the residency program, including changes in the curriculum.

## V.    FACTS UNDERLYING THE FRAUD SCHEMES

### A.  The Fraudulent Scheme to Submit Claims for Non-Reimbursable Teaching Physician and Podiatry Resident Services

#### 1.  Outpatient Podiatry Clinic Claims

46.    Part of Relator's duties as a resident in the PMSR Program at CIH was to see patients at the CIH Outpatient Podiatry Clinic ("Clinic").  The residents treat Clinic patients every Monday, Tuesday, Wednesday and Friday, between the hours of 9 a.m. and 3 p.m.

47.     Upon information and belief, the Clinic treats, on average, between 40-60 patients per day and a significant number of the Clinic patients are covered under either Medicare or Medicaid.  These patients were seen in the Clinic by Relator and her colleagues in the PMSR Program for a variety of podiatry-related conditions.

48.     Donovan, the PMSR Program Director, seldom attends Clinic patient visits, or has any personal role whatsoever in the care of these patients, whose treatment was almost always conducted entirely by the Relator and the other residents in the PMSR Program.  During such visits, the residents diagnosed patient conditions and performed podiatry-related procedures, including nail and foot debridements, administering injections, treating foot conditions affecting diabetic patients and surgical procedures such as suturing lacerations, bone biopsies, skin biopsies, and skin graft/ matrix application, among other types of care.

49.     Sometimes, the Clinic patient visits are conducted by the residents when Donovan is in his hospital office or elsewhere at CIH.  At other times, the visits are conducted when Donovan is physically off-site at one of his private practice locations (which include offices in Brooklyn and Manhattan), or at his Staten Island home or elsewhere, due to personal illness, vacation plans, his attendance at a medical conference or simply because he is attending to his own private patients.  Notwithstanding Donovan's complete lack of involvement in the care of these patients, and Federal Health Care Program reimbursement rules requiring Donovan's personal involvement,  Defendants have billed and continue to bill the Federal Health Care Programs for Donovan's services as if he were present for each patient visit and personally involved in the treatment rendered.

50.     For example, on May 11, 2012, Relator personally treated seven patients, six of whom were covered by Medicaid, at the Clinic.  Printouts from the CIH electronic medical

record system for the seven patients treated solely by Relator on May 11, 2012 state that Donovan is the "Billing Prov" and includes an "Attndg Note" by Donovan entered on May 14, 2012.  On that same day, another podiatry resident, Dr. Ryan Muchowski, was also in the Clinic seeing patients alongside Relator.   On the same date, Donovan attended the 10th Annual Innovations in Complex Vascular & Endovascular Interventions Emphasis on: Complex Arterial and Venous Vascular Procedures, Management Options for Non–healing Wounds & Advances in Podiatric Wound Management, hosted by the Columbia University Department of Surgery, and held at the Marriott Marquis, 1535 Broadway at 45th Street, New York, New York 10036, with two other podiatry residents.  The conference occurred during the same period that Relator and Dr. Muchowski were treating podiatry patients at the Clinic.  At no time during these patient encounters, was Donovan present or even within the same county.

51.   For each of these seven patients that Relator personally treated at the Clinic on May 11, 2012, Donovan nonetheless entered notes on the morning of May 14, 2012 – after his return from the medical conference -- in the electronic medical record system purporting to document that he was both the billing and attending physician.  Donovan's notes make statements such as "the patient tolerated the visit well" and "tolerated LIDO/Steroid injection well for painful heal," which falsely indicate that he was present for the patient encounter.

52.   Relator's encounter notes for these services, and the encounter notes of other podiatry residents, were entered into the CIH electronic medical record system to be reviewed and/or amended by Donovan.  After Donovan entered an attending note, and information on each patient visit, including the specific services rendered and the associated billing codes, was collected by Defendants, such services were billed to the Federal Health Programs under Defendants' standard operating procedures.

53.     As a result of Donovan's fabricated entries in the medical records, Medicare and Medicaid were fraudulently billed for Donovan's professional services.   Medicare and Medicaid also were fraudulently charged by HHC, CIH, PAGNY and/or Donovan for the unlicensed, unsupervised outpatient services of podiatry residents.

54.     Defendants' billing for Clinic patient visits that Donovan did not personally attend, and which were handled by unsupervised podiatry residents such as Relator, occurred on a regular basis.   Sometimes these visits occurred when Donovan was away from the hospital on vacation, taking a sick day, attending a conference or attending to his own patients at one of his private practice locations.   At other times, the visits occurred when Donovan was physically present at CIH, but otherwise occupied.   Upon information and belief,  such conduct has been occurring at least from in or about 2006, which is when Donovan became PMSR Program Director.

### 2.  Inpatient Podiatry Claims

55.     As a podiatry resident, Relator also was responsible for providing inpatient podiatric treatment.   Relator estimates that, since the time she began her resident training, the PMSR Program had approximately 3-7 inpatient consults per day, five days per week.   Upon information and belief, a significant number of the inpatient consults performed by Relator, as well as by other podiatry residents at CIH, were covered by Medicare or Medicaid.

56.     As with the Clinic patients, Donovan seldom attends such inpatient visits, or has any personal role in the care of these patients, whose treatment was almost always conducted entirely by the Relator and other residents in the PMSR Program.   During such visits, the residents diagnosed patients and performed podiatry-related procedures such as  debridements, drainage of abscesses, and surgical procedures such as suturing lacerations, bone biopsies, skin biopsies,

tendon repair, digit repair, metatarsal head resection, and skin graft/ matrix application, among other forms of treatment.

57.     Relator's encounter notes for these services, and the encounter notes of other podiatry residents, were entered into the CIH electronic medical record system to be reviewed and/or amended by Donovan.  After Donovan entered an attending note and information on each patient visit, including the specific services rendered and the associated billing codes, was collected by Defendants, such services were billed to the Federal Health Programs under Defendants' standard operating procedures.

58.     Notwithstanding Donovan's complete lack of involvement in the care of these patients, and Federal Health Care Program reimbursement rules requiring that Donovan be personally involved,   Defendants have billed and continue to bill the Federal Health Care Programs for Donovan's services as if he had personal involvement in the treatment rendered. Medicare and Medicaid also were fraudulently charged by HHC, CIH, PAGNY and/or Donovan for the unlicensed, unsupervised inpatient services of podiatry residents.

59.     Defendants' billing for inpatient visits that Donovan did not personally attend, and which were handled by unsupervised podiatry residents such as Relator, occurred on a regular basis.  Sometimes these visits occurred when Donovan was away from the hospital on vacation, taking a sick day, attending a conference or attending to his own patients at one of his private practice locations.  At other times, the visits occurred when Donovan was physically present at CIH, but otherwise occupied.  Upon information and belief, such conduct has been occurring at least from in or about 2006, which is when Donovan became PMSR Program Director.

### 3. Emergency Room Podiatry Claims

60.      As a podiatry resident, Relator also was responsible for consulting on emergency room patients requiring podiatric treatment at CIH.   Relator estimates that, since the time she began her resident training, the PMSR Program had approximately 1-2 emergency room consults per day, seven days per week.   A significant number of the podiatry emergency room consults performed by Relator, as well as by other podiatry residents at CIH, are covered by Medicare and Medicaid.

61.      As with the Clinic patients and inpatient consults, Donovan seldom attends such emergency room visits, or has any personal role in the care of these patients, whose treatment was almost always conducted entirely by the Relator and other residents in the PMSR Program. During such visits, the residents diagnose patients and perform invasive surgical procedures such as suturing lacerations, bone biopsies, skin biopsies, tendon repair, and digit repair, among other forms of treatment.

62.      Relator's encounter notes for these services, and the encounter notes of other podiatry residents, were entered into the CIH electronic medical record system to be reviewed and/or amended by Donovan.  After Donovan entered an attending note, and information on each patient visit, including the specific services rendered and the associated billing codes, was collected by Defendants,   such services were billed to the Federal Health Programs under Defendants' standard operating procedures.

63.      Notwithstanding Donovan's complete lack of involvement in the care of these patients, and Federal Health Care Program reimbursement rules requiring his personal involvement,  Defendants have billed and continue to bill the Federal Health Care Programs for Donovan's services as if he had personal involvement in the treatment rendered.   Medicare and

Medicaid also were fraudulently charged by HHC, CIH, PAGNY and/or and Donovan for the unlicensed, unsupervised emergency room services of podiatry residents.

64.     Defendants' billing for emergency room visits that Donovan did not personally attend, and which were handled by podiatry residents such as Relator, occurred on a regular basis.  Sometimes these visits occurred when Donovan was away from the hospital on vacation, taking a sick day, attending a conference or attending to his own patients at one of his private practice locations.  At other times, the visits occurred when Donovan was physically present at CIH, but otherwise occupied.  Upon information and belief, such conduct has been occurring at least from in or about 2006, which is when Donovan became PMSR Program Director.

**4.  Claims Based on Treatment by Legally Unauthorized Residents**

65.     Pursuant to New York Education Law § 7008, in order for an unlicensed resident to practice podiatry under the auspices of a GME program like the PMSR Program at CIH, he or she must obtain a limited residency permit. Such permits are good for one year and can be renewed for one to two additional years at the discretion of the New York State Department of Education.  Absent such a permit, a resident is without any legal authority to practice podiatry in New York State and cannot render podiatric treatment or issue prescriptions to patients. Furthermore, practicing podiatry without legal authority, or aiding and abetting another individual to do so, is a Class E felony under New York Education Law § 6512.

66.     Neither Medicare nor Medicaid will pay for services furnished by practitioners who are not authorized by law to provide the services in question.  As relevant here, Medicare defines a resident as "one who is formally accepted, enrolled, and participating in an approved medical residency program, including programs in . . . podiatry, as required in order to become certified by the appropriate specialty board." 42 CFR § 413.75(b).  Since residents may not participate in

an approved residency program in New York State without a residency permit, services furnished by non-permitted residents are non-reimbursable under Medicare.

67.     Medicaid similarly will only pay for services "provided by qualified . . . practitioners within the scope of their practice as defined by State law" and will not pay for services which are "professionally unacceptable" as, for example, practicing a profession "fraudulently beyond its authorized scope" or rendering care while "one's license to practice is suspended or revoked." New York State Medicaid Program, Information for All Providers, General Policy, pp. 7, 23-24. In addition, all Medicaid claims carry a Claim Certification Statement by the provider that all care and services were rendered in compliance with federal and state laws and regulations, as well as all DOH policies. New York State Medicaid Program, Information for All Providers, General Billing, pp. 7-8.  Since residents may not provide care or services under State law if they do not possess a valid residency permit, services furnished by non-permitted residents are non-reimbursable under Medicaid.

68.     Quinton P. Yeldell began his podiatry residency in the PMSR Program on July 1, 2011. From July 1, 2011 until March of 2012, Dr. Yeldell treated patients at CIH as a part of his residency training.   However, during this same period, Dr. Yeldell was not licensed as a podiatrist and did not have a valid limited residency permit. Dr. Yeldell did not obtain a valid residency permit (permit number P83541) until on or about March 29, 2012, according to the New York State Department of Education, Office of Professions, Online Verification Search Database.

69.     Upon information and belief, notwithstanding Dr. Yeldell's lack of a limited residency permit – and hence lack of any legal authority to practice podiatry in New York State – Donovan and CIH knowingly permitted him to write prescriptions and treat and perform

surgeries on patients at CIH, on a daily basis, for a period of eight months, including numerous situations in which Dr. Yeldell was completely unsupervised, thereby deliberately circumventing New York's licensing requirements and potentially placing every patient who encountered Dr. Yeldell at risk.  Defendants did not terminate Dr. Yeldell from the PMSR Program until in or about March 2012.

70.    Dr. Yeldell was a participant in at least the following surgical cases during the period when he did not have the requisite New York State limited residency permit: (i) On September 9, 2011, Dr. Yeldell assisted on a bunionectomy/arthoplasty of the left foot of a 59-year-old female patient; (ii) On November 4, 2011, Dr. Yeldell assisted on a bone biopsy of the left foot of a 54-year-old male patient; (iii) On January 3, 2012, Dr. Yeldell assisted on a cyst removal of the right foot of a 23-year-old female patient; (iv) On January 1, 2012, Dr. Yeldell assisted on an arthroplasty of the left foot of a 58-year-old female patient; and (v) On January 26, 2012, Dr. Yeldell assisted on an arthroplasty of the fifth digit of a 35-year-old patient.  Dr. Yeldell, upon information and belief, also treated patients in the Clinic, Emergency Room and on an inpatient basis during the same period.

71.    Defendants submitted charges to Medicare and Medicaid indicating Donovan as the attending physician and that were based on treatment and surgeries performed by Dr. Yeldell in the PMSR Program from July 1, 2011 to in or about March 2012, notwithstanding that Dr. Yeldell lacked the required limited residency permit to practice podiatry as a resident in New York State.  Since the services performed were not lawfully rendered by a resident as required for reimbursement, all amounts charged and paid for such services are fraudulent.

72.    Michael Andrew Walters, began his podiatry residency in the PMSR Program on July 1, 2009.  From July 30, 2010 to June 30, 2011, his second year of training, Dr. Walters

treated patients at CIH as a part of his final year of residency training. However, during this entire time period, Dr. Walters was not a licensed podiatrist and did not have a valid limited residency permit. During this same period, Dr. Walters was, pursuant to his appointment by Donovan as Program Director, the Chief Resident in the PMSR Program. As Chief Resident, Dr. Walters supervised and taught junior residents, and also assumed more significant responsibilities in clinical matters.

73. Dr. Walters publicizes on his Linkedin.com profile (http://www.linkedin.com/pub/michael-walters-d-p-m/8/64b/284) that his responsibilities as a Chief Resident included, "Manage staff of four residents; Oversee daily clinic with an average of 60 patients; Performed over 300 surgical procedures; Treat ailments of the foot that include nail deformities, fractures and dislocations, bunion and hammertoe deformities, heel pain, sprains and strains, diabetic evaluation and treatment, gout, gait and biomechanical disorders. Research; Pharmaceutical lectures and training, Prescribing prescriptions."

74. Upon information and belief, notwithstanding Dr. Walter's lack of a limited residency permit – and hence lack of any legal authority to practice podiatry in New York State – Donovan and CIH knowingly permitted him to write prescriptions and treat and perform surgeries on patients at CIH, on a daily basis, for a period of eleven months, including numerous situations in which Dr. Walters was completely unsupervised, thereby deliberately circumventing New York's licensing requirements and potentially placing every patient who encountered Dr. Walters at risk. Dr. Walters graduated from the PMSR Program in June 2012.

75. Dr. Walters was a participant in at least the following surgical cases during the period when he did not have the requisite New York State limited residency permit: (i) On September 9, 2010, Dr. Walters assisted on an arthoplasty of the left foot of a 58-year-old female

32

patient; (ii) On September 10, 2010, Dr. Walters assisted on a bunionectomy/arthoplasty of the right foot of a 59-year-old-female patient; and (iii) On November 18, 2010, Dr. Walters assisted on an arthoplasty of the left foot of a 46-year-old male patient.  Dr. Walters, on information and belief, also treated patients in the Clinic, Emergency Room and on an inpatient basis during the same period.

76.    Defendants submitted charges to Medicare and Medicaid indicating Donovan as the attending physician and that were based on treatment and surgeries performed by Dr. Walters in the PMSR Program from July 30, 2010 to on or about June 30, 2011, notwithstanding that Dr. Walters lacked the required limited residency permit to practice podiatry as a resident in New York State.   Since the services performed by Dr. Walters were not lawfully rendered by a resident as required for reimbursement, all amounts charged and paid for such services are fraudulent.

**B.   The Fraudulent Scheme to Conceal Material Defects in the PMSR Program in Order to Maintain "Approved" Status and Ensure Continued GME Funding**

77.    When Relator began her graduate podiatry education training in the PMSR Program in July 2010, she expected that the CPME-approved Program would provide her with the training required to become a board-certified podiatrist and would otherwise comply with all of the standards and requirements of an approved residency program.  Relator, however, came to learn that the PMSR Program not only failed to comply with most of the core requirements for maintaining CPME approval, as set forth in CPME Institutional and Program Standards, but also that the Program operated unlawfully and in a fraudulent manner.

78.    The billing fraud described above, in addition to evidencing Donovan's repeated willingness to falsify PMSR Program medical records relating to patient encounters, highlights

the utter lack of faculty supervision of podiatric residents by Donovan, which not only violated CPME Program Standard 6.0 *et seq.*, but also violated New York State Education Law § 7008, requiring that podiatric residents such as Relator and her colleagues function only "under the administrative supervision of a licensed podiatrist serving as the residency director."

79.     Donovan was the only attending podiatrist in the PMSR Program to supervise activities of all of the residents at CIH since at least between July 1, 2010 and in or about 2014. Upon information and belief, this supervisory structure existed at least from in or about 2006, when Donovan became PMSR Program Director.   In addition to being the PMSR Program Director, Donovan maintains a full-time private practice that includes office locations in Brooklyn and Manhattan.   Relator regularly contacted Donovan to update him on patient interactions via text message while Donovan was at his private office off-site of CIH, or at his Staten Island home.   In Relator's experience, Donovan rarely attended inpatient podiatry consults, emergency room consults, and Clinic consults in any capacity and, upon information belief, did not regularly supervise the other residents in the PMSR Program.   Although Donovan did make himself available to supervise surgical procedures performed by residents in the CIH operating rooms, upon information and belief, many of those patients were referred through Donovan's private practice, further evidence that Donovan focused on his own service responsibilities at the expense of the educational development of the residents, in violation of CPME Institutional Standard 3.12.

80.     This total abdication of supervisory responsibility by the PMSR Program Director resulted in significant patient safety concerns as well as a training program for graduate podiatry residents that was a travesty of medical education.   For example, on August 9, 2010, Relator repaired a severely lacerated toe of a five-year-old girl in the Emergency Room of CIH entirely

on her own, without any supervision by Donovan.  Similarly, on November 23, 2010, Relator

repaired a severely lacerated flexor tendon of a 42-year-old male patient, with no attending

supervision whatsoever.  Relator noted in both medical records that she "discussed findings,

assessments and proposed recommendation with supervising attending," which meant that she

phoned and traded text messages with Donovan while he was either in one of his off-site office

locations or at his Staten Island home, after she had managed the care of the patient entirely on

her own.

81.    A similar absence of faculty supervision occurred routinely at all levels of care of

podiatry patients being treated within the PMSR Program at CIH, raising troubling patient safety

issues and violating core CPME Program Standards mandating adequate faculty training

resources and supervision (CPME Program Standards 5.5, 6.9).

82.    As noted, Defendants' failure to provide adequate faculty supervision seriously

compromised the educational imperatives underlying the PMSR Program and mandated in

CPME's Program Standards, as well as the safety of podiatry patients at CIH.  The absence of

faculty supervision, however, was not the only material deficiency in the PMSR Program.  As

discussed in detail below, certain aspects of the PMSR Program were downright unlawful, and

the entire operation of the Program was nothing short of fraudulent.

83.    An obvious minimum requirement for any GME program to be considered

"approved," including the PMSR Program at CIH, is that the residents participating in the

program must be authorized under State law to practice their specialty -- in this case podiatric

medicine and surgery – as a program participant.  As previously noted, however, at least two

graduate podiatry residents in the PMSR Program in the period between July 2010 and March

2012 participated in the PMSR Program without the limited residency permit required under

New York State Education Law § 7008. Dr. Yeldell and Dr. Walters both participated in the PMSR Program, for eight months and eleven months respectively, during which time they treated patients on a daily basis, without having the requisite limited residency permit.

84.    Incredibly, in the case of Dr. Walters, during his final year of residency training (from July 30, 2010 through June 30, 2011), he was named the Chief Podiatry Resident, and yet he did not even have the limited residency permit required to lawfully practice podiatry during that period. The Chief Podiatry Resident is a highly significant and responsible position within the PMSR Program. According to a PMSR Program policy regarding the responsibilities of the Chief Podiatry Resident, provided to Relator on May 9, 2012 by CIH personnel, the Chief Resident's responsibilities include, "…the supervision of all the podiatry residents and serves as a liaison between the program director and the resident staff."

85.    It is also a CPME requirement that the PMSR Program have a podiatry residency manual that includes policies and mechanisms affecting the resident, rules and regulations, curriculum, training schedule, assessments, a didactic activities schedule, and a journal review schedule (CPME Institutional Standard 3.10). CPME further requires that the residency manual be distributed to and acknowledged in writing by the resident at the beginning of the program (*Id.*). However, Relator and other residents in the PMSR Program did not receive any podiatry-specific information of any kind earlier than May 9, 2012, almost two years after Relator began her residency training at CIH, and did not receive anything that could be considered a "manual" until after Relator complained about the lack of a PMSR manual to the CIH Human Resources Department, as detailed further below.

86.    Notably, the information that was finally provided to Relator in May 2012 included a policy statement declaring that:

36

> Podiatry Residents cannot start their program without an official affidavit from NYS permitting resident to practice Podiatry in NYS. It is the Resident's responsibility to procure this document and required signatures. In addition, annual renewals are the responsibility of resident. A resident may not continue to practice at the hospital without this document.  Any resident, knowingly practicing without this document will be immediately terminated from the program and have the results of their termination be part of the file any letters sent out to any entities.

Nevertheless, as evidenced in the cases of Drs. Walters and Yeldell, the PMSR Program either made no attempt to verify that its podiatry residents had obtained the necessary limited residency permits, or deliberately permitted non-permitted residents to participate in the Program and treat patients.  Neither the PMSR program nor Dr. Donovan reported to CPME that podiatry residents were operating without limited residency permits.   Moreover, the PMSR Program issued a graduate certificate to Dr. Walters even though he "graduated" the Program without having a limited residency permit for almost his entire last year of training.

87.    CPME requirements also mandate that the PMSR Program Director provide instructions to the residents on medical record keeping and on their entries to the residency case logs (CPME Program Standards 6.2, 6.6).   At no time was Relator trained in record keeping matters related to podiatry and, upon information and belief, neither were the other residents in the PMSR Program during the same period.   In addition, residents must receive formal evaluations at regular intervals (CPME Program Standard 7.2).  Relator, however, never received a formal evaluation of her performance in podiatry assignments while she was a resident in the PMSR Program and, upon information and belief, the lack of a formal evaluation process was a standard operating procedure for the PMSR Program at CIH from at least July 1, 2010 to July 1, 2012.  As detailed further below, it was not until Relator complained about the lack of an evaluation process to the CIH Human Resources Department that the PMSR Program hurriedly

instituted an evaluation process for residents in podiatry which, upon information and belief, still does not satisfy CPME requirements for resident evaluations.

88.    In addition to the medical record fraud and other critical program deficiencies described above, Relator discovered that Donovan created and caused the creation of other false entries in official PMSR Program records in order to fraudulently portray the Program as being in compliance with CPME requirements pertaining to the training of residents.

89.    Podiatry residents are required to keep track of their cases and patient interactions throughout the term of their residency in order to document that they have met the necessary training requirements for graduation, as well as board certification eligibility.  For this purpose, the PMSR Program utilizes an online data base called the Podiatry Residency Resource ("PRR"). Residents are required to enter their patient interactions into the PRR System, and the interactions are then supposed to be reviewed and verified by Donovan as the Program Director (CPME Program Standards 6.6, 7.1).  If a resident does not attain the requisite number of surgical procedures, patient interactions, and other relevant competencies, the resident is not able to obtain a diploma and graduate from the PMSR Program.

90.    In 2012, CPME notified Donovan that, upon a review of records of Dr. Walters and his podiatry co-resident, there were deficiencies in Dr. Walters' patient encounters, particularly a lack of biomechanical examinations.

91.    In July and August of 2012, Donovan required Relator to reenter all of her cases into the PRR system as a result of alleged inaccuracies in her case logs.  During this process of reentering her cases, Relator discovered that a significant number of her cases had been verified by Donovan and transferred to other residents in the PMSR Program, even though those residents had not actually handled the cases at issue.  For example, 17 biomechanical

examinations performed and documented by Relator in the respective patient medical records maintained at CIH had been transferred by Donovan to another PMSR resident, Dr. Walters.   In addition, another 39 procedures performed by Relator were given to various other residents in the PMSR Program.   Upon information and belief, Donovan falsified these PRR records in order to conceal from CPME the defective training provided to podiatry residents in the PMSR Program, to preserve the Program's CPME accreditation and approved status, and to demonstrate that there was a sufficient number of patient encounters to support the number of increased residency positions had the program converted from two to three years.

92.   Relator also came to learn that Donovan was falsifying records of prior PMSR residents who had already graduated from the Program in order to reflect their participation in clinical experiences that had not occurred.   Upon information and belief, Donovan did this because the PMSR Program at CIH was moving from a two-year to a three-year residency program, which would entail renewed scrutiny from CPME, and Donovan needed to ensure that the PMSR Program records could withstand such scrutiny and could demonstrate that there was a sufficient number of patient encounters to support the number of increased residency positions.

93.   In a series of text messages involving Relator and Dr.   Walters that occurred between May 2012 and August 2012, Dr. Walters, who had graduated from the PMSR Program thirteen months earlier, discussed how Donovan had recently urged him to amend Dr. Walters's PRR logs to add certain podiatry patient interactions called biomechanicals that Donovan claimed were missing from the logs, and that Donovan had even gone so far as to coerce his cooperation by raising the prospect of negating his second year of residency for lack of a residency permit.   On May 26, 2012, at 9:10 a.m., Dr. Walters advised Relator that Donovan had threatened to "nullify" his second year of residency unless he rectified the situation involving his

biomechanicals by amending the official record or returning to perform the procedures after the fact. In a text message dated August 8, 2012, at 4:45 p.m., Dr. Walters informed Relator that Donovan had contacted him two days earlier about his PRR logs and requested that Dr. Walters come to meet Donovan. Dr. Walters further stated that he thought this was a strange request given that he was no longer in the Program. On August 14, 2012, at 12:47 p.m., Dr. Walters sent Relator another a text message stating that Donovan informed him that none of his biomechanicals were documented in the quadramed (electronic medical record system at CIH) and requested that Dr. Walters fill out a form for each of these patient records in order to meet the necessary graduation requirement of 75 biomechanical interactions, or return to the PMSR Program to perform the procedures.

94.    Donovan requested that Dr. Walters make entries for cases that Donovan fraudulently transferred from Relator to Dr. Walters, thereby seeking to hide the fact that Dr. Walters should not have graduated the PMSR Program and to demonstrate that there was a sufficient number of patient encounters to support the number of increased residency positions had the program converted from two to three years. Upon information and belief, Donovan has taken similar fraudulent actions in the PRR system for other residents in the PMSR Program in order conceal inadequacies in their training and avoid losing valuable CPME approval.

95.    A GME program that allows legally unauthorized residents to practice podiatric medicine and perform surgeries, and that falsifies official GME program records to bill for teaching physician services, to "graduate" program residents and to conceal egregious program deficiencies, cannot reasonably be deemed "approved" for purposes of Medicare and Medicaid reimbursement. Nor could the PMSR Program at CIH ever have maintained its approved status if CMS and CPME had known of such blatant misconduct, in addition to all the other critical

violations of core CPME Institutional and Program Standards described above.   Certainly, a

podiatric medicine and surgery residency program that tolerates such practices cannot be said to

be "established and conducted in an ethical manner" (CPME Institutional Standard 3.12).

However, on information and belief, CPME did not know of Defendants' misconduct because it

was never reported by Defendants to CPME pursuant to PMSR Program requirements mandating

that CPME be notified regarding "the conduct of" and "substantive changes to" the Program

(CPME Institutional Standards 4.0-4.2).

96.    Further, after CPME brought Relator's allegations concerning core deficiencies in

the PMSR Program to the attention of CIH and asked CIH to respond, CIH responded to the

allegations with additional fraudulent misrepresentations calculated to falsely reassure CPME

and keep those deficiencies from coming to light.   Among other things, CIH falsely represented,

in response to Relator's complaint of inadequate faculty and supervision in the PMSR Program,

that the podiatry division at CIH had "3 attendings on staff," when, in reality, Donovan was the

only attending at CIH with any direct involvement in the PMSR Program and his supervisory

functions outside the Operating Room were virtually non-existent.   Other claims by CIH,

including that Donovan was available to residents "24/7" and that he met with residents regularly

and reviewed their logs monthly to ensure they were meeting the requirements of the PMSR

Program likewise were fraudulent misrepresentations.

97.    Nor were any of these deficiencies disclosed to CMS and the Medicare and

Medicaid programs when Defendants submitted the costs associated with the PMSR Program for

reimbursement year after year in CIH's cost reports.   Those cost reports formed the sole basis on

which Medicare and Medicaid made all DME and IME payments to CIH, and Defendants were

determined to keep the GME funding pipeline open at all costs.   Accordingly, CIH, HHC

PAGNY and/or Donovan concealed the fraud and misconduct that permeated the PMSR Program from CMS, as well as from CPME.  Every annual cost report filed by CIH from in or about 2006 through at least in or about 2014 that claimed DME and IME costs associated with the PMSR Program without disclosing the fraud infecting the Program, or the fact that CIH was dishonestly maintaining the Program's "approved" status, constituted a false claim for GME funding.  By perpetrating this massive deception against CMS, DOH and the PMSR accrediting body, Defendants committed egregious GME fraud in violation of the False Claims Act.

### C.  The Scheme to Terminate Relator's Employment in Retaliation for Her Complaints About Donovan's Fraudulent Conduct

98.     Upon information and belief, Defendants targeted Relator for dismissal from the PMSR Program after learning that she had made a formal complaint against Donovan for the fraudulent conduct described above.

99.     From March 1, 2012 to April 30, 2012, Relator was on maternity leave from the PMSR Program for the birth of her second child.   On April 29, 2012, the day before Relator was due to return from maternity leave, Relator accessed her PRR case log and entered a significant number of patient interactions that she had previously handled, but was unable to enter, before leaving on maternity leave.  Podiatry residents were routinely permitted to modify their case logs, and make any necessary corrections or changes, until such time as the entire log was transmitted to the applicable podiatric medicine organizations upon graduation.

100.   On May 18, 2012, there was a meeting with Donovan and all the residents of the PMSR Program, including Relator, at which Donovan announced a random audit of the residents' PRR logs.  The surprise audit apparently had been prompted by a report concerning a surgical resident at another hospital who had been terminated for falsifying case logs.  Immediately after the meeting, Relator contacted Donovan by e-mail and advised that she would

need to make clarifications and corrections to some of the log entries she made on April 29, 2012, and requested permission to access the PRR system for that purpose. Notwithstanding that Donovan, upon information and belief, routinely permitted other residents to make similar corrections to their PRR logs, Donovan denied Relator's request, stating that any discrepancies in her logs could be addressed at the conclusion of the audit.

101.   On May 30, 2012, Donovan notified Relator that, as result of alleged irregularities in her PRR logs, she was being reassigned from her clinical duties to the CIH library, pending an investigation. This notification surprised Relator, as she had previously notified Donovan of these inaccuracies on May 18, and expected to have an opportunity to correct her logs just as other residents in the PMSR Program routinely had done. At the time this action was taken, Relator occupied the position of Chief Resident in the PMSR Program, and had never been the subject of any disciplinary action. In fact, Donovan had previously offered that Relator continue in the position of Chief Resident for an optional third-year of training in the PMSR Program, an offer made possible by the then pending conversion of the PMSR Program at CIH from a two-year to a three-year training program. Relator had accepted the offer, but did not need a third year of training to graduate the PMSR Program, since the three-year training requirement did not apply to residents in her class year.

102.   As a result of her reassignment, Relator spent her time in the CIH library studying and reviewing journal articles and HHC policy materials, among other things. It was during this time that Relator came across an HHC memo regarding an employee's responsibility to report billing irregularities to HHC's Compliance Department. Relator also reviewed Medicare requirements for the proper billing of teaching physician services. Based on her review, Relator came to realize that Donovan had fraudulently billed for professional services based on Relator's

treatment of patients at the Clinic on May 11, 2012, while Donovan was not even in the same county, let alone at CIH.   On June 5, 2012, Relator submitted an extensive letter to the CIH Human Resources Department complaining about the PMSR Program's non-compliance with CPME requirements, including the lack of an appropriate podiatry-specific residency manual and evaluation process.  On June 6, 2012, Relator submitted a detailed report to the HHC compliance department regarding Donovan's fraudulent billing activities and lack of resident supervision.

103.   Relator also decided, with the assistance of the Committee of Interns and Residents/SEIU ("CIR"), which was the union that represented Relator as a resident in the PMSR Program, to initiate a grievance process challenging her reassignment.   The first step in that process was for Relator, CIR and the CIH Head of Human Resources to meet.   A meeting was scheduled for June 22, 2012.

104.   On June 22, 2012, Relator attended a meeting with the CIH Human Resources Director Rodney Parker and Relator's CIR representative in furtherance of her grievance challenging the reassignment of her clinical duties.   At this meeting, Mr. Parker proposed a resolution, pursuant to which Relator would be permitted to review and make corrections to her entire case log on the PRR system and then be issued a graduate certificate from the PMSR Program based on her having satisfied the requirements for graduation.   Relator agreed to this proposal and was thereafter given an opportunity to complete the extensive process of reviewing and re-entering all of her case logs into the PRR system.   It was during this review and reentry process that Relator discovered further improprieties in the medical documentation.   Specifically, Relator found that a significant number of her cases, which had been verified by Donovan, were transferred to other residents in the PMSR Program, despite the fact that those residents had not actually performed the cases at issue.

105.   On August 3, 2012, in direct violation of his own proposal and the agreement reached with Relator at the June 22, 2012 meeting -- an agreement that Relator had already started to execute by reviewing and re-entering her case logs – Mr. Parker issued a written recommendation to terminate Relator's employment and participation in the PMSR Program. Relator was informed by her CIR representative that this change was spearheaded by Donovan, who pressured Mr. Parker to rescind his offer to resolve the grievance.  Upon information and belief, Donovan pressured Mr. Parker to issue a termination recommendation in retaliation for Relator's June 12, 2012 report to HHC of Donovan's billing improprieties.

106.   As set forth above, Relator was subjected to adverse employment actions, including her recommended termination, because she complained of compliance violations constituting Medicare and Medicaid fraud.  Defendants had no legitimate, non-retaliatory reason for terminating Relator's employment, their stated explanation for Relator's recommended termination was a pretext for retaliation, and the retaliatory actions taken against Relator were malicious and/or or in reckless disregard of her civil rights.  At all times relevant to this action, Relator's job performance was exemplary, and she would not have been targeted for termination but for her complaints concerning compliance violations constituting Medicare and Medicaid fraud.

VI.   **CAUSES OF ACTION**

**COUNT ONE**
**(Federal False Claims Act)**
**31 U.S.C. § 3729(a)(1)(A)**

107.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 106 above as though fully set forth herein.

108.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

109.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States government for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

110.   The United States, unaware of the falsity of the claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

111.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

112.   Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT TWO
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(B)

113.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 112 above as though fully set forth herein.

114.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

115.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted facts, that were material to false or fraudulent claims, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

116.   The United States, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

117.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

118.   Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT THREE
**(Federal False Claims Act)**
**31 U.S.C. § 3729(a)(1)(G)**

119.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 118 above as though fully set forth herein.

120.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

121.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

122.   The United States, unaware of the falsity of the records and statements and of the Defendants' concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

123.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

124.   Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT FOUR
## (Federal False Claims Act)
## 31 U.S.C. § 3729(a)(1)(C)

125.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 124 above as though fully set forth herein.

126.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

127.   By virtue of the acts described above, Defendants conspired with each other and with others unknown to defraud the United States by inducing the United States to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of 31 U.S.C. § 3729(a)(1)(C). Defendants, moreover, took substantial steps in furtherance of the conspiracy, *inter alia*, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

128.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

129.   Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729(a)(1)(C) as described herein.

## COUNT FIVE
## (New York False Claims Act)
## <u>N.Y. Finance Law § 189(1)(a)</u>

130.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 129 above as though fully set forth herein.

131.   This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*, as amended.

132.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to New York State for payment or approval, within the meaning of N.Y. Finance Law § 189(1)(a).

133.   New York State, unaware of the falsity of the claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

134.   By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

135.   Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT SIX
## (New York False Claims Act)
## <u>N.Y. Finance Law § 189(1)(b)</u>

136.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 135 above as though fully set forth herein.

137.   This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*, as amended.

138.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted facts, material to false or fraudulent claims, within the meaning of N.Y. Finance Law § 189(1)(b).

139.    New York State, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

140.    By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

141.    Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

**COUNT SEVEN**
**(New York False Claims Act)**
**N.Y. Finance Law § 189(1)(g)**

142.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 141 above as though fully set forth herein.

143.    This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq*., as amended.

144.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of N.Y. Finance Law § 189(1)(g).

145.     New York State, unaware of the falsity of the records and statements and of the Defendants' concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

146.     By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

147.     Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT EIGHT
### (New York False Claims Act)
### N.Y. Finance Law § 189(1)(c)

148.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 147 above as though fully set forth herein.

149.     This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq*., as amended.

150.     By virtue of the acts described above, Defendants conspired with each other and with others unknown to defraud New York State by inducing New York State to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of NY Finance Law § 189(1)(c). Defendants, moreover, took substantial steps in furtherance of the conspiracy, inter alia, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

151.     By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

152.   Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## PRAYER FOR RELIEF

WHEREFORE, Relator, acting on behalf and in the name of the United States of America and New York State, demands and prays that judgment be entered against Defendants under the Federal False Claims Act as follows:

(1)     That Defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.* and N.Y. Finance Law §§ 187 *et seq.* as set forth above;

(2)     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

(3)     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages that New York State has sustained because of defendants' actions, plus a civil penalty of not less than $6,000 and not more than $12,000 for each violation of N.Y. Finance Law §§ 187 *et seq.*;

(4)     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and N.Y. Finance Law § 190;

(5)      That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

(6)     That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a

trial by jury.

Dated: July 31, 2015

By:  _Kevin P Mulry_

Kevin P. Mulry, Esq.
Farrell Fritz, P.C.
1320 RXR Plaza
Uniondale, New York 11556-1320
Tel. (516) 227-0620

Geoffrey R. Kaiser, Esq.
Kaiser Law Firm, PLLC
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 570-3071

David A. Zarett, Esq.
Weiss & Zarett, P.C.
3333 New Hyde Park Road, Ste. 211
New Hyde Park, New York 11042
Tel. (516) 627-7000

Attorneys for Plaintiff-Relator
Irina Gelman, DPM

53