FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 25 2017 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA and NEW
YORK STATE, ex rel. IRINA GELMAN, DPM,

                    Plaintiffs,

              -against-

GLENN J. DONOVAN, DPM, NEW YORK CITY
HEALTH and HOSPITALS CORPORATION, and
PHYSICIAN AFFILIATE GROUP OF
NEW YORK, PC,

                    Defendants.
-----------------------------------------------------------x

**MEMORANDUM & ORDER**

12 CV 5142 (RJD)

DEARIE, District Judge.

        The qui tam relator Irina Gelman, formerly a resident in podiatry at Coney Island Hospital, brings this action on behalf of the United States of America under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 et seq., and on behalf of the State of New York under its equivalent statute, N.Y. Finance Law §§ 187 et seq.[1] Gelman alleges that the hospital's podiatric medicine and surgery residency program operated in contravention of important statutory standards, regulatory requirements, and contractual obligations, as well as basic safety and honesty imperatives, and that it made impliedly false certifications to the contrary in its claims for Medicaid and Medicare reimbursement and annual program funding.

        The accusations are disquieting: Gelman alleges, among other things, that the residents—graduate students in training, not licensed podiatrists—were rarely supervised when

---

[1] "The FCA is an anti-fraud statute that may be enforced not just through litigation brought by the Government itself, but also through civil *qui tam* actions that are filed by private parties, called relators, in the name of the Government." U.S. ex rel. Chorches v. American Medical Response, Inc., 865 F. 3d 71, 78 (2d Cir. 2017) (internal quotations and citations omitted).

rendering podiatric services to patients; that at least two, including one promoted to Chief Resident, practiced podiatry while lacking the permit required to participate in a residency; that the program director regularly falsified patient records to camouflage his failure to supervise; that the director also falsified certain residents' records to conceal deficiencies from program-accreditation authorities; and that Gelman, after bringing these problems to light, was fired in retaliation. The defendants' fraudulent concealment of these matters, by omission from almost a decade's worth of filings for government monies, allegedly cost the Medicaid and Medicare systems millions of dollars.

Defendants move to dismiss the Amended Complaint under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. As explained below, except for the state law claim against New York City Health and Hospitals Corporation, which is dismissed upon plaintiffs' concession, ECF Doc 64 at 16 n.1, the motion to dismiss is in all other respects denied.

## BACKGROUND

For purposes of the motion, the Amended Complaint is liberally construed, all non-conclusory factual allegations are assumed to be true, and all reasonable inferences are drawn in Gelman's favor. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); County of Erie, NY v. Colgan Air, Inc., 711 F.3d 147, 149 (2d Cir. 2013).[2]

---

[2] "[L]abels and conclusions," "naked assertions devoid of further factual enhancement" and "legal conclusion[s] couched as factual allegation[s]"—which heavily populate the Amended Complaint—are irrelevant for 12(b)(6) purposes. Iqbal, 556 U.S. at 678 (internal quotations and citations omitted).

Gelman entered the podiatry residency program after receiving her Doctorate in Podiatric Medicine (DPM) in July 2010. Her duties included inpatient, outpatient and emergency room podiatry consultations and surgical assistance along with the corresponding entry of notes in the hospital's electronic patient records system. AC ¶6. In late 2012 or 2013, after attaining the position of Chief Resident, Gelman was terminated in retaliation for reporting to defendant New York City Health and Hospital Corporation the program deficiencies and false billing practices that are the subject of this lawsuit. AC ¶¶ 6, 101-105.

Defendant Glenn J. Donovan, DPM, a licensed podiatrist in the State of New York, was at all relevant times director of the hospital's podiatric residency program. AC ¶ 7. He was "the only attending podiatrist in the . . . [p]rogram to supervise activities of all the residents" for the period July 2010 through in or about 2014. AC. ¶ 79. During the relevant time, Donovan also maintained a full-time private practice with offices in Brooklyn and Manhattan. Id.

Although the allegations are both under- and overpled, with repetition and hyperbole often replacing desired specifics, three basic charges against Donovan and the hospital loudly and clearly emerge. The first is that Donovan essentially abdicated his responsibility, as director, to supervise the graduate podiatry students in his charge, but nevertheless billed Medicaid and Medicare for the podiatric services the students rendered as if he performed them or was present. To accomplish this, Donovan made post hoc entries in patients records that signified, falsely, either his participation in the treatment or his contemporaneous presence.[3]

---

[3] Donovan's whereabouts are vaguely alleged: he "was "[s]ometimes" elsewhere in the Hospital, and "[a]t other times" was "physically off-site at one of his private practice locations" in Brooklyn and Manhattan, or at his Staten Island home, or on vacation, or at a medical conference, or attending to his own private patients. AC ¶ 49.

Gelman makes the sweeping accusation that this practice of podiatry by unsupervised residents occurred "on a regular basis," and "over the course of several years," beginning in or about 2006 when Donovan became director of the program, AC ¶¶ 3, 54, 59, 64, principally in the hospital's Outpatient Clinic, but also in the emergency room and in the treatment of hospital inpatients. AC ¶¶79; ¶¶ 46-64.[4] Her allegations, however, include only one specific incident, which Gelman labels an "example" (AC ¶ 50): on May 11, 2012, while on duty in the Outpatient Clinic, Gelman treated seven patients, six of whom were covered by Medicaid; that same day, Donovan was at a medical conference in midtown Manhattan with two podiatry residents. Gelman later discovered (AC ¶¶ 102) that the medical record for each of the seven patients falsely identified Donovan as both the billing and attending physician. Apparently, three days after the Gelman treated the patients, on the day Donovan returned from the medical conference, Donovan entered notes that "falsely indicate that he was present for the encounter." AC ¶ 51. The notes state, for example, that "the patient tolerated the visit well" and "tolerated LIDO/Steroid injection well for painful heal." Id. No specific, comparable instances of unsupervised resident treatment of inpatient or emergency room podiatry patients are alleged.

As for the sine qua non of a False Claims Act—the actual false bills—Gelman's allegations again lack specifics. She pleads only that through Donovan's "fabricated entries in the medical records" and "[d]efendants' standard operating procedures," AC ¶ 52-53, the podiatric services rendered by residents were billed to Medicare and Medicaid as if Donovan had personal involvement in the treatment. Though one could well wish for more examples or

---

[4] See Transcript of Oral Argument, April 13, 2017 at 28 (plaintiffs' counsel, when addressing the possibility of amending to provide additional specifics, remarks that the outpatient clinic is "where the bulk of the [residents'] work was done").

4

greater precision in exchange for the bombast, liberal construction of the pleading reveals, as noted, the basic charge to be that, during Donovan's review of unsupervised residents' entries in the patient record system, he entered attending notes or billing codes (or both) sufficient convey the false impression that he had whatever level of personal involvement in the treatment would be necessary for reimbursement. See AC ¶ 52 (outpatient context) ¶57 (inpatient context), ¶63 (emergency room).[5] The only other details Gelman offers are estimates of total patients treated by unsupervised podiatry residents during the relevant time: (i) 40 to 60 per day, four days a week, in the Outpatient Clinic; (ii) 3-7 inpatient consults daily, five days a week; and (iii) 1-2 emergency room consults daily, seven days a week. Upon Gelman's information and belief, Medicare or Medicaid covered a "significant number of" these patients. AC ¶¶ 47, 55, 60.

The second principal charge is that Donovan knowingly allowed the rendering of podiatric services by two residents who lacked the permit required by law to participate in a hospital residency, and that he then defrauded the government by concealing this defect when claiming Medicaid and Medicare reimbursement for their services. The two are Gelman's fellow program residents Quinton P. Yeldell and Michael Andrew Walters: each either did not obtain, or failed to renew, the limited residency permit ("LPR") that New York's Education Law § 7008 requires for a resident to practice podiatry in a hospital setting,[6] yet Donovan nevertheless permitted both to write prescriptions, treat patients, and perform surgeries daily during the time

---

[5] For the reasons to be discussed, see *infra* at 15-16, the Court need not reach, at this time, the question of the quantity and nature of supervision required by the applicable regulations.

[6] Defendants do not engage in an interpretive quarrel with Education Law § 708's LPR requirement, or with New York Education Law § 6512, which Gelman also cites, which makes it a Class E felony to practice podiatry without legal authority.

they lacked an LPR. AC ¶¶ 65-72.[7] Walters also supervised and taught junior residents and assumed more significant responsibilities in clinical matters after Donovan elevated him to Chief Resident while he still lacked an LPR. AC ¶ 72.[8] The actionable false claims were made when defendants submitted charges to Medicare and Medicaid for treatments and surgeries performed by Yeldell and Walters during the time each lacked an LPR without disclosing that credentialing defect or by misrepresenting that Donovan performed the services. AC ¶¶ 71, 76.

Gelman's third basic charge is that the improprieties just discussed, and still others to be addressed, were concealed to avoid jeopardizing the federal and state funds earmarked for approved Graduate Medical Education ("GME") programs such as hospital residencies, which defendants received annually. See generally 42 U.S.C. § 1395ww(h), 42 C.F.R. §§ 412.105 and 413.75 et seq.; AC ¶¶ 38-39 (legal allegations not challenged in defendants' motion papers). The key word is "approved;" in the field of podiatry, that designation is apparently bestowed by the Council on Podiatric Medical Education of the American Podiatric Medical Association ("CPME") once it is satisfied that a program complies with all applicable CPME-published standards. Of note, beginning with its first year of provisional approval, a podiatric residency program must file with CPME an annual report disclosing various categories of information that affect its approval status. AC ¶ 45. The amount of GME funds contributed to an "approved" program, in turn, is based on information furnished by the educational institution (here, the

---

[7] Gelman's allegations on this subject are detailed, including the relevant dates and specific surgical procedures in which Walters and Yeldell participated. AC ¶¶ 70-75.

[8] The allegations cite Walters' linkedin.com profile, where he states that, as chief resident, he managed a staff of 4 residents, oversaw a daily clinic treating an average of 60 patients daily, performed more than 300 surgical procedures, and wrote prescriptions. AC ¶ 73.

6

hospital) in cost reports filed annually with Medicare and Medicaid. See generally 42 C.F.R. §§ 413.76, 413.77; N.Y. Public Health Law § 2807-c; 10 N.Y.C.R.R. Part 86; AC ¶ 39 (law not challenged in defendants' motion papers).

Returning to the allegations: Gelman claims that the hospital falsely maintained the program's "approved" status by failing to disclose in its annual reports to CPME the many problems with the program discussed above, as well as other defects, all allegedly grounds for non-approval. An especially disquieting such allegation is that Donovan not only made false entries in patient records but also fraudulently manipulated information in certain *residents'* academic records in order to falsely represent that these residents had satisfied the necessary requirements for graduation and, in turn, board certification eligibility. For example, Donovan "transferred" 17 biomechanical examinations performed by Gelman (and so documented in the hospital's records) to Walters, whose patient encounter numbers in that category were low. Gelman also discovered that Donovan redistributed another 39 procedures she performed from her records to those of other residents. AC ¶¶ 88-91. Donovan's falsification of resident records extended to program graduates who, because of insufficient clinical encounters or other deficiencies, should not in fact have been graduated; Gelman cites one instance of Donovan pressuring a former program participant to fabricate post hoc entries for cases Donovan had fraudulently transferred to his records. AC ¶¶ 93-94. Gelman believes Donovan's motivation was the possibility that the program might convert from a two- to a three-year residency, which would entail increased CPME scrutiny. AC ¶ 92.

Gelman alleges that because of these many problems and still others, the podiatry residency program, in violation of a host of CPME standards (AC ¶¶ 43-44, 77-97), maintained its "approved" status only because it failed to disclose these violations in the annual report it

7

filed with CPME; later, when Gelman herself tried to blow the whistle, the hospital falsely reassured CPME with further misrepresentations. AC ¶ 96. The annual cost reports that the hospital in turn filed with Medicaid and Medicare—on the basis of which, as noted, the amount of GME funding was calculated—failed to disclose "the fraud infecting the [p]rogram, or the fact that the [hospital] was dishonestly maintaining the [p]rogram's 'approved status." Each such cost report, Gelman alleges, "constituted a false claim for GME funding." AC ¶ 97.

## DISCUSSION

**LEGAL STANDARDS**

### A. Federal Rule of Civil Procedure 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft, 556 U.S. at 678 (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. There is no litmus test: "[d]etermining whether a complaint states a plausible claim" is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." Id. In general, plausibility is understood as lying between probability and mere possibility. Id. at 678 ("The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."). In short, to survive at 12(b)(6), a plaintiff must "nudge[ ] [her] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

## B. False Claims Act

The FCA imposes liability on any person who: "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or caused to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(A), (B).[9] A "claim" is defined as "any request or demand . . . for money or property" that is presented, directly or indirectly, to the United States, which includes any 'reimbursement requests made to the recipients of federal funds under federal benefits programs." Universal Health Services, Inc. v. U.S. ex rel. Escobar, 136 S. Ct. 1989, 1996 (2016). (citing 31 U.S.C. § 3729(b)(2)(A)).

"Fraud under the FCA has two components: the defendant must submit or cause the submission of a claim for payment to the government, and the claim for payment must itself be false or fraudulent." U.S. ex rel. Chorches v. American Medical Response, Inc., 865 F. 3d 71, 83 (2d Cir. 2017) (internal quotation, citation and alteration omitted). The theory of falsity advanced in this case is what is commonly referred to as "implied false certification," which the Supreme Court now recognizes to be actionable "at least in certain circumstances."[10] Universal

---

[9] Count One of the Amended Complaint, invoking subparagraph (A), concerns the false claims filed with Medicaid and Medicare whereas Count Two, invoking subparagraph (B), seeks to impose liability separately for the falsification of patient, resident and other records "material to" the false claims. Count Three invokes a separate subparagraph, (G), which imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Finally, Count Four invokes the FCA's conspiracy provision, 31 U.S.C. § 3729(a)(1)(C).

[10] As the Court understands the pleading and the parties' briefs, none of the other theories of FCA liability—such as factual falsity (when the goods or services described in the claim are

9

Health, 136 S. Ct. at 1996. Specifically, omissions are actionable when: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." 136 S. Ct. at 2001.

The materiality requirement is "rigorous," id. at 1996 and "demanding," id. at 2003, "because the FCA is not a vehicle for punishing garden-variety breach of contract or regulatory violations." Id. There is, however, no litmus test: as the Court explained, "[d]efendants can be liable for violating requirements even if they were not expressly designated as conditions of payment," and "[c]onversely, even when a requirement is expressly designated a condition of payment, not every violation gives rise to liability." Id. "What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement *that the defendant knows is material to the Government's payment decision.*" Id. (emphasis added).

The Court enumerated multiple *evidentiary* indicia of materiality[11] that can be understood as requiring, at the pleading stage, allegations plausibly tending to show that a governmental

---

inaccurate or phantom) or express legally falsity (when compliance with a specific statute or regulation has been expressly misrepresented)—is implicated here.

[11] The Court explained:

> proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or,

recipient of the alleged false claim would have rejected payment had it known the whole story. See 31 U.S.C. § 3729(b)(4) (FCA itself defines "material" to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property"); Universal Health, 136 S. Ct. at 2002 ("without deciding whether § 3729(a)(1)(A)'s materiality requirement is governed by § 3729(b)(4) or derived directly from the common law," explains that "[u]nder any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation") (internal quotation, citation, and alteration omitted).

Indeed, both the facts of Universal Health and the Court's hypotheticals illustrate that materiality is essentially a matter of common sense rather than technical exegesis of statutes and regulations. See Universal Health, 136 S. Ct. at 2000, 2004 (omissions materials because *"[a]nyone* informed that a social worker" counseled teenagers "would probably" conclude that he met "core" statutory requirements "central to the provision of mental health counseling" such as "specialized training in children's services" and "the prescribed qualifications for the job") (emphasis added); id. at 2001-2002 (*"a reasonable person would realize* the imperative of a functioning firearm" when fulfilling a federal gun order "even if the Government did not spell...out" that "guns it orders must actually shoot") (emphasis added).

---

> if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

Universal Health, 136 S. Ct. at 2003-2004.

11

C.  **Particularity**

Allegations of FCA fraud must also satisfy the heightened pleading standard of Rule 9(b). Chorches, 865 F.3d at 81; see Fed. R. Civ. P. 9 (b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake"). Rule 9(b) is "designed to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the institution of a strike suit." U.S. ex rel. Ladas v. Exelis, Inc., 824 F.3d 16, 26 (2d Cir. 2016). Rule 9(b) typically requires a plaintiff alleging fraud to identify the specific statements alleged to be fraudulent as well as who made them, when, where, and why. Ladas, 824 F.3d at 25.

In Chorches, however, the Second Circuit announced a different standard for *qui tam* FCA suits: "In applying Rule 9(b) to the submission of false claims under subsections 3729(b)(2)(A) and (B) of the FCA, we decline to require that every *qui tam* complaint allege on personal knowledge specific identified false invoices submitted to the government." 865 F.3d at 85. Instead, "a complaint can satisfy Rule 9(b)'s particularity requirement by making *plausible* allegations creating a *strong* inference that specific false claims were submitted to the government and that the information that would permit further identification of those claims is peculiarly within the opposing party's knowledge." Id. (emphasis added).

ANALYSIS

A.  **Plausibility and Specificity**

The dispositive question is whether, "constru[ed] liberally" with "all reasonable inferences [drawn] in the plaintiff's favor," County of Erie, 711 F.3d at 149 (internal quotation and citation omitted), the Amended Complaint pleads enough factual content "to allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal,

556 U.S. at 678. Because the "misconduct alleged" in an FCA case is the filing of false claims, application of the Iqbal standard here necessarily incorporates the Chorches standard, which, as noted, likewise has plausibility as its keynote.

Drawing on its experience and common sense, the Court concludes, both for Chorches and Iqbal purposes, that the balance of considerations tips in plaintiffs' favor on plausibility, and in the main, her pleading survives the motion to dismiss. Beneath and between the bombast, hyperbole and superfluity, the essential allegations against defendants, as already summarized, are plainly discernible[12] and, if true, would establish FCA liability under section 3729(a)(1). See Chorches, 865 F.3d at 83 (FCA fraud is, simply, submission of claim for payment to the government that is false).

The heart of defendants' briefs in support of the motion to dismiss and their oral argument, which pre-date Chorches, issued in July 2017, is that the Amended Complaint fails to plead any specific false bills, the sine qua non of FCA liability. The absence of specific bills, this line of argument continues, not only makes it impossible to discern any misrepresentations made by any defendant to any governmental body, but necessarily forecloses any plausible view of the misrepresentations as material. Indeed, absent the pleading of a specific bill, defendants even argue that the so-called "teaching physician rule" allegedly violated by Donovan's rare presence among his practicing podiatric interns "is simply not implicated." ECF 66 (reply brief) at p. 6.

Chorches renders much of this line of argument moot, as it essentially absolves Gelman for failing to plead specific bills, provided that the filing of *specific* false claims is *strongly* and

---

[12] See, e.g., ECF No. 63 at 10-12 (defendants' motion papers aptly summarizing the allegations),

13

*plausibly* inferable from her allegations. Id., 865 F.3d at 85. The Court concludes that the necessary inferences are available.

To be sure, the quantity of specific incidents alleged is greatly disproportionate to the length of the pleading (more than 150 paragraphs spanning more than 50 pages)—and far less than what was pled in Chorches—but what specifics are alleged are compelling: the outright falsification of outpatient records by the program's own director, the open practice of podiatry by residents lacking the basic permit required by state law, the doctoring of residents' academic records to avoid jeopardizing accreditation (and in turn, federal program funding), and abdication of the supervision that is the sine qua non of an *educational* program. Common sense and judicial experience validate Gelman's allegation that many of the patients treated at Coney Island Hospital were Medicaid or Medicare eligible; it is also a matter of common sense that Coney Island Hospital would and did seek to get paid and so would have regularly filed reimbursement claims throughout the period alleged.

The strong inferences that these allegations create is self-evident: first, something was seriously amiss at Coney Island Hospital's podiatry residency program, and second, *Donovan himself* believed that the contents of patient and resident records that he falsified would be important—presumably, to recipients of bills based on those records, or auditors, or accreditation institutions like CPME.[13] Furthermore, the allegation that Gelman was the victim of adverse employment action in retaliation for her efforts to expose the many improprieties described casts

---

[13] The third branch of Gelman's allegations are plainly sufficient in this regard, as they specifically name documents alleged to be false claims under section 3729(a)(1)(A) or false records material to the false claims under section 3729(a)(1)(B): the annual reports defendants filed with CPME and the annual cost reports filed with Medicare and Medicaid.

14

the entire body of allegations in an even more serious and credible light, and thus, to the extent they needed it, helps "nudge[ ] [them] across the line from conceivable to plausible." Twombly, 550 U.S. at 570.

## B. Materiality

Gelman is cautioned that, though her lawsuit survives the motion to dismiss, it lives in the shadows of the FCA's rigorous materiality requirement. As Universal Health emphasizes, the FCA "is not an all-purpose antifraud statute," nor "a vehicle for punishing garden-variety breaches of contract or regulatory violations." 136 S. Ct. at 2003 (internal quotation and citation omitted). It may be something of a plaintiff's windfall at this stage that materiality under Universal Health is essentially an evidentiary question, but the day of reckoning will come at summary judgment.

As discussed above, however, the Court understands Universal Health as requiring, at the pleading stage, that the undisclosed regulatory and other violations be plausibly pled as relevant to the payment decision, either as a matter of common sense,[14] or in the mind's eye of the filer of the claim.[15] This much Gelman has indeed accomplished: without reaching the question of how

---

[14] As noted, but worthy of underscoring, the Court explained, inter alia: (i) that certain omissions were material because *"[a]nyone* informed that a social worker" counseled teenagers "would probably" conclude that he met "core" statutory requirements "central to the provision of mental health counseling" such as "specialized training in children's services" and "the prescribed qualifications for the job," 136 S. Ct. at 2000, 2004 (emphasis added), and (ii) that *"a reasonable person would realize* the imperative of a functioning firearm" when fulfilling a federal gun order "even if the Government did not spell…out" that "guns it orders must actually shoot." Id. at 2001-2002 (emphasis added).

[15] As already noted, but also worthy of underscoring, the Court stated: "What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement *that the defendant knows is material to the Government's payment decision."* 136 S. Ct. at 2003 (emphasis added).

15

much supervision of podiatry residents is an express condition of payment (and if that question is answered differently for Medicaid and Medicare), or the comparable set of questions involving other statutory, regulatory, CPME, and contractual provisions cited in the Amended Complaint, the Court is satisfied that their relevance to the payment decision has been adequately pled. In the parlance of Universal Health, because residents are, after all, still only graduate *students*, "a reasonable person would realize the imperative" of adequately supervising their treatment of actual patients. Likewise, "anyone informed" that a program "approved" by its field's accrediting body would assume that approval was validly earned and that its participants were lawfully authorized to participate. Finally, Donovan's alteration of the content of internal hospital records strikes a potent materiality chord, as it strongly indicates *his* belief that that content would be important.

## CONCLUSION

For the reasons discussed, the state law claims (Counts 5 through 8) are dismissed as against defendant New York City Health and Hospitals Corporation on plaintiff's concession, and defendants' motion to dismiss is in all other respects denied.

SO ORDERED.

Dated: Brooklyn, New York
September 21, 2017

s/ RJD
_____
RAYMOND J. DEARIE
United States District Judge